Brady, J.
The plaintiff sues to recover salary unpaid under a written employment agreement with defendant. Defendant denies liability, mainly on the ground that an express contingency of the contract, namely sufficient funding from investors, never occurred. Defendant also counterclaims for damages for breach of fiduciary duty and for money lent. The case was tried before me, jury-waived, from March 19 to March 24, 2003.1 find and rule as follows.
FINDINGS
1. Plaintiff entered into a written employment agreement with defendant in December 1999 (exhibit 2). Prior to accepting employment with defendant, plaintiff had been employed by Arthur D. Little, Inc. (ADL) from 1988 to 1999, working essentially as a new product development consultant. Plaintiff has an undergraduate degree from Rhode Island School of Design in industrial design. He also has an MBA from Boston University.
2. Defendant Biofertec, LTD (Biofertec) is a start-up company which holds patents relating to an in-vitro fertilization method. The company was founded by Dr. *206 Claude Ranoux, a physician who developed a method by which a gamete (unfertilized mixture containing sperm and egg) can be incubated inside a woman’s body rather than in an incubator in a laboratory. For several years Dr. Ranoux and his two business partners, attorneys Jo Ann Jorge and Frank Gleason,[1] have been engaged in an effort to raise funds for Biofertec to market Dr. Ranoux’s incubation technology. Until Biofertec received venture capital funding in the fall of2001, Ranoux, Jorge and Gleason comprised its Board of Directors.
3. Plaintiff first had contact with Biofertec and its three principals in 1998 while at ADL. ADL had been retained to prepare a proposal for the commercialization of Biofertec’s technology; but Biofertec could not afford ADL’s recommendations. Biofertec and ADL then began to consider the possibility of “partnering” in the venture. The parties explored the possibility that ADL would obtain an equity interest in Biofertec in return for its work. Plaintiff was Biofertec’s main contact at ADL, and had worked on ADL’s evaluation of the possibility of “partnering” with Biofertec. He was familiar with defendant’s financial circumstances from his work for it at ADL.
4. In October 1999 plaintiff received a negative review from his boss at ADL, Arthur Schwope. Plaintiffs productivity numbers were down for various reasons, and Schwope told him that unless his numbers improved he would be let go. Plaintiffs salary was reduced from $160,000 to $118,000. ADL also offered plaintiff a six-month severance package. Plaintiff decided to take the severance package and seek employment elsewhere. At or about the time of plaintiffs decision to leave ADL, Jorge was at ADL for a meeting attended by plaintiff. Following the meeting, plaintiff told Jorge that he was leaving ADL and might be interested in working for Biofertec. Jorge, surprised, asked him why he was leaving ADL. Plaintiff explained that he was unhappy with his boss, had received a good severance package, and felt it was time “to roll the dice” with a startup company. Jorge was a little bewildered that plaintiff had an interest in working for Biofertec, and explained that Biofertec had little money, had not been paying salary to the three principals, and that any salary which Biofertec would pay him would be contingent on the raising of sufficient capital. But plaintiff said Biofertec was his “first choice.” Several follow-up meetings took place during which Biofertec’s principals made clear, among other things, that salary payments were contingent upon sufficient funding.
5. Jorge and Gleason were working under an employment agreement calling for an annual salary of $125,000, with stock options. Plaintiff was willing to accept similar terms, understanding that salary was contingent on sufficient funds.
6. Section 1.3 of the Employment Agreement, captioned “Base Salary, ” provides: “As soon as is practical, as determined by the Board of Directors, following the execution of this Agreement, the Company shall pay the Executive at an annual rate equal to $125,000 payable in accordance with the normal payroll practices of the Company for its executives.” “As soon as is practical” meant as soon as sufficient funds were available. Whether there was enough money available to pay salary was to be determined by the Board of Directors.
7. Plaintiff wanted to be sure that the unpaid salary would accrue. Jorge assured him that it would and explained in an e-mail of December 8, 2003 (Exhibit 3) that the Company would begin paying the salary as soon as there were sufficient funds and would make every attempt to pay whatever amount it could prior to the receipt of funds sufficient to pay full salary. Jorge also explained that all accruals would be paid upon the Company’s receipt of sufficient capital, and that the only event that she “could foresee that would preclude full payment of accruals is if a venture capitalist, who controls all disbursements of their investment, refuses to pay debts outstanding as of the day of their investment.” Following the receipt of the e-mail, plaintiff signed the employment agreement.
8. Plaintiffs duties included redrafting the business plan, networking with potential investors, and assisting in presentations to potential investors. He worked mainly from his home. Biofertec maintained a small office in Winchester, and on occasion he would work there.
9. Plaintiff was finishing up his M.B.A. at Boston University (paid for by ADL) when he began employment with Biofertec. In January 2000, he interested one of his classmates and study group partners, Robert Baima, in investing in Biofertec. (Exhibit 5.) Baima could not afford the minimum investment of $25,000, so he attempted to interest two of his fellow employees at Lotus in sharing the investment. One of his potential co-investors, however, came to a negative evaluation of the product because his wife did not think that women would likely accept placing the gamete container (a small elongated tube) in their bodies in order for fertilization to occur. When, in early March 2000, plaintiff inquired of Baima where he stood on the investment, Baima responded in substance that he was lukewarm. Plaintiff then said that if he were Baima he would not invest because he did not think the Company would make it. By then plaintiff had worked approximately three months for Biofertec and had not been paid.
10. Plaintiffs ADL severance package was to end in mid-April 2000. He was naturally concerned that he was not receiving salary payments from Biofertec, and he pressed the issue with the three principals. Biofertec had immediate and significant financial obligations, including payment of foreign patent fees necessary for the survival of the company. The principals, who likewise were not being paid, were sympa *207 thetic to plaintiff and, notwithstanding the problems, Biofertec paid plaintiff $5,000 on March 20, 2000. Plaintiff contends that this was back salary; Biofertec claims that it was a loan. The testimony of plaintiff and Jorge, who dealt with plaintiff concerning the payment of money, is conflicting concerning what was said about the nature of this payment when it was made. Nothing was withheld from the $5,000 check for taxes or social securily. Jorge did not document this payment as a loan, notwithstanding Biofertec’s accountant’s clear warning to her that unless loans to company executives were documented, taxing authorities would likely regard them as salary. Plaintiff did not report this check as income on his 2000 income tax returns.
11. A second payment was made to plaintiff on April 24, 2000 in the amount of $3,500. (Exhibit 29.) Again, plaintiff and Jorge are in direct conflict about what was said about this payment. Nothing was withheld. Jorge did not document the payment as a loan, and plaintiff did not report it as income.
12. Biofertec next paid plaintiff by two checks dated May 3, 2000, one for a net of $10,930 and the other for a net of $6,766. Check 2252 ($6,766) was marked for “May payroll.” Check 2250 ($10,930) was marked for “partial payment of accrued salary.” The gross amount of the two checks before withholding was $28,500. Also on May 3, the three principals paid themselves gross salary as follows: Ranoux-$14,417; Jorge-$10,000; Gleason-$10,000.[2]
13. In early May 2000, after receiving the two checks, plaintiff went on a trip to Ireland. He returned on May 16, but did not immediately contact Biofertec. Jorge felt that this was unusual because an important meeting with a potential investor which plaintiff had arranged had occurred in his absence, and she wondered why plaintiff was not interested in the outcome. On May 17 Jorge left plaintiff a message about an upcoming investor meeting, and asked him to meet the principals at the Winchester office the next morning to discuss it. At this May 18 meeting Jorge expressed puzzlement concerning why he had not contacted them upon his return from Ireland. Plaintiff then admitted that he had been “doing something else” with a company which was trying to develop an infrared technique with respect to the pooling of blood in the cranium. Jorge, feeling somewhat betrayed, asked plaintiff why he would “jump ship” now when Biofertec’s prospects seem to be on the rise. (Biofertec had recently received $300,000 from an investor, and were close to settling an important patent lawsuit.) Plaintiff explained that he felt that he had a “good fit” with the other company, but that he wished to continue to work with Biofertec, perhaps in the role of a consultant. Discussion then followed about the terms of a possible consultantship, including the rate of pay and certain guaranteed hours. The Biofertec principals were open to a possible consultant relationship, and were agreeable to paying the plaintiff at a rate of $100 per hour, but rejected any arrangement which would guarantee plaintiff a certain number of hours. It was left that if Biofertec needed plaintiff for consulting work, it would contact him. Essentially nothing was agreed upon other than the plaintiffs rate of pay would be $100 per hour, should Biofertec seek his services as a consultant.
14. On June 12, 2000 plaintiff wrote a letter to Biofertec which purported to be his formal resignation of his position with Biofertec, and providing the 60-day notice required by the employment agreement. (Exhibit 6.) The letter also purported to memorialize alleged agreements reached between plaintiff and Biofertec to waive the reciprocal sixty-day notice provisions in the employment agreement in lieu of a consulting agreement. The letter set out plaintiffs version of what they had agreed to. The final paragraph of the letter asserted that plaintiff was owed $20,833.33[3] in back pay, had earned $8,368.90 in vested stock options, and that payment was subject to the terms of the employment agreement, Jorge’s email of December 8, 1999, and the employment laws of the Commonwealth. Plaintiff also indicated that he was unwilling to wait for the payment of the accrued salary beyond December 1, 2000.
15. The June 12, 2000 letter did not accurately recount the substance of the May 18, 2000 meeting. The parties did not discuss the reciprocal sixty-day notice provisions. No meeting of the minds occurred on the consulting arrangement. Plaintiffs “deadline” of December 1,2000 for the payment of accrued salary was arbitrary.
16. The letter angered Jorge, and she promptly responded by telephone. She took issue with the content of the letter. The two had a contentious and unpleasant conversation, and that essentially ended the relationship between plaintiff and Biofertec.
17. In the fall 2001, Biofertec was successful in persuading a consortium of venture capitalists to invest in the Company, and Biofertec received approximately $3.3 million of restricted venture capital funds. With certain exceptions spelled out in the stock purchase agreement (Exhibit 32), the investors would not allow these new funds to be used to pay past liabilities, including salaries. This is a typical requirement of venture capital investments, and was foreseen by Jorge in her December 8, 1999 e-mail.
18. The paramount issue in this lawsuit is “sufficient funds.” From the inception of the Company in 1996 to the fall of 2001 the principals had raised unrestricted funds from private investors of $1,609,510. In the same time frame the Company spent nearly $1,600,000 on patent annuity fees ($150,000), legal fees and costs, including amounts to repurchase stock in the patent infringement case ($420,000), other legal fees ($45,000), office expenses including rent, utilities and equipment ($125,000), *208 accountemps ($20,000), promotional expenses including trade shows, printing, copying, etc. ($110,000), salary ($500,000), loans to employees ($177,000) and health insurance ($51,000).
The principals did not treat themselves more favorably than plaintiff during the 5V2 months he worked for Biofertec. To May 31, 2000 payments to the three principals and the plaintiff, including what the company calls “loans,” were as follows: plaintiff-$37,000; Ranoux-$18,500; Jorge-$12,500; and Gleason-$10,000. Following plaintiffs departure, the principals, in June, July, and September 2000, paid themselves additional salary totaling as follows: Ranoux-$25,230; Jorge-$27,500; Gleason-$27,500. The total gross salary and loans paid to the three principals and plaintiff in the year 2000 was as follows: plaintiff- $37,000; Ranoux - $43,146; Jorge - $40,000; Gleason - $37,500. The three principals did not pay themselves any salary in 2001 until the venture capital funds were in place.[4] They did, however, borrow $95,886 from the Company prior to the venture capital funds. (Exhibit 13, p.5.)
DISCUSSION
Plaintiffs Claims
The complaint is in four counts. Count I is for violation of the Massachusetts Wage Act, G.L.c. 149, Section 148. Count II is for breach of contract. Count III, entitled “promissory estoppel,” alleges that Biofertec induced plaintiff to waive “his right to 60 days of further employment” by promising to retain him as a consultant. Plaintiff claims damages on count III for additional salary for 60 days. Count IV is for breach of the covenant of good faith and fair dealing, claiming that upon learning of plaintiffs voluntary resignation, Biofertec induced him to[1] forego additional salaries which would be owed under the contract in return for a consultancy agreement when they never intended to utilize his services. On the four counts of the complaint I find and rule as follows.
1. On counts I and II, I find for defendant. As the parties understood, Biofertec was not obliged to pay salary unless sufficient funds were available. Whether sufficient funds were available was in the discretion of the Board of Directors. The Board may not act unreasonably in not paying salary, but at no time prior to the fall of 2001 were sufficient funds available. I credit Jorge’s testimony that the Company had other pressing financial needs, which she itemized in detail during trial, which prevented it from paying plaintiffs entire accrued salary. The venture capital funds were restricted. The investors would not permit the payment of back salary, which in the case of the three principals was hundreds of thousands of dollars, regarding it as “sweat equity.” The possibility of restricted funds was covered in Jorge’s e-mail of December 8, 1999. Plaintiff is not entitled to be paid from those funds. That another justice of the Superior Court ruled on a motion for summary judgment that the wage act applies [15 Mass. L. Rptr. 489] does not help the plaintiff because he has not proven that the condition of payment, sufficient funds, ever occurred.
The three principals made every effort to pay plaintiff, notwithstanding the Company’s financial straits. They did not treat themselves more favorably than plaintiff; to the contrary, when plaintiff quit, he had been paid more than the principals. That the principals paid themselves additional salary in June, July and August does not support plaintiffs argument that Biofertec therefore had sufficient funds to pay him. As noted, they had not received as much money as plaintiff had previously; and I cannot say that it was unreasonable for the principals to conclude that the working partners had priority over plaintiff who left abruptly.
Finally, it merits emphasis that plaintiff well knew that his work for Biofertec was a “roll of the dice.” He went into this relationship with his eyes open. By early March, as evidenced by his conversation with Baima, he had apparently lost faith.
2.1 likewise find and rule for defendant on counts III and IV. On count III, Biofertec made no promises to employ plaintiff as a consultant. They simply said that they would call him if they needed him. There was no discussion of waiver of the reciprocal sixty-day notice provisions, Biofertec did not “induce” plaintiff to do anything; he voluntarily resigned his employment.
3. On the other issues raised by defendant as defenses, I find and rule as follows.
a. Plaintiff did not fraudulently induce Biofertec to employ him by misrepresenting why he was leaving ADL. The inquiry made by Jorge was general, and plaintiff had no duty to respond by relating the specific issues which his boss at ADL had explained to him. “Differences with the boss” was sufficient under the circumstances. Had Jorge wished to obtain more specifics she could have asked plaintiff and/or his boss.
b. Plaintiff did not breach his fiduciary duty to Biofertec by stating to Baima, after Baima told him he was unlikely to invest in March 2000, that he himself would not invest because he did not think the Company would make it. Defendant attributes too much significance to a candid comment made to a classmate, who was unlikely to invest anyway.
c. Plaintiff did not breach the employment agreement by failing to return documents to Biofertec after resigning. The documents now complained of by Biofertec were still on plaintiffs computer. Biofertec never asked him to delete them or to return them. Biofertec never complained that he was violating any confidentiality agreements or revealing or using trade *209 secrets in any way and there is no reason to believe that he was.
d. Plaintiff did not breach the employment agreement by failing to devote full time to the business of Biofertec. He quit on May 18. His invoices to Neu-roptdx dated June 16,2000 reflect that he did not start to work for it until late May. His admission to Jorge and the other principals that he was “doing something else” is not enough to persuade me that he was violating his contract with Biofertec.
Counterclaims
1. Defendant has waived counts I, II, III, VI, and VIII. Count V was dismissed on summary judgment. Count IV seeks recovery on the basis of breach of fiduciary duty, namely plaintiffs statement to Baima to the effect that if it were him, he would not invest in Biofertec because he did not think the Company would make it. For the reasons stated previously, I find for plaintiff on count IV of the counterclaim.
2. On count VII, money lent, I likewise find for plaintiff. Defendant has the burden of proof that the money advanced on March 20 and April 20, 2000 were loans, not salary. Biofertec has not sustained its burden. I am persuaded that the intent of Biofertec in providing plaintiff with these checks without withholding was simply to put as much money as possible in his pocket. Regarding these payments as loans is a stretch, particularly without the documentation that the accountant had clearly warned Jorge was necessary. Although plaintiffs failure to report the money as income is some evidence that he too may have regarded these payments as loans, it is not sufficient to persuade me that the court should regard them as such. Nor does the fact that similar undocumented “loans” were made to the principals alter my view that, at least between Biofertec and plaintiff, the payments were in fact salary.
ORDER
Judgment shall enter for defendant on counts I through IV of the complaint. Judgment shall enter for plaintiff on counts IV and VII of the counterclaim. No costs shall be awarded.

Whom I refer to from time to time in this Memorandum as “the three principals.”

Ranoux’s annual salary was $185,000; Jorge’s and Gleason’s annual salary was $125,000.

Because I conclude that plaintiff resigned on May 18, 2000, I calculate that his accrued salary to the date of his resignation, 5Vz months after beginning employment, was $20,292 (.450 x $125,000, less $37,000 paid = $20,292).

Strictly speaking a bridge loan of $375,000 was received before the venture capital funds but the loan was intended to be and was repaid when the venture capital funds were in place.